Timothy LOONEY, Jr., Plaintiff,

v.

The CITY OF WILMINGTON, DELA-WARE, Donald R. Roberts and Jeffrey DeHart, in both their individual and official capacity as officers and employees of the Police Department of the City of Wilmington, Delaware, Defendants.

Civ. A. 88–573–CMW.

United States District Court, D. Delaware.

Oct. 23, 1989.

Edmund D. Lyons, Jr., of Aerenson, Ferrara & Lyons, Wilmington, Del., for plaintiff.

Laurence V. Cronin, Asst. City Sol., City of Wilmington Law Dept., Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

On October 18, 1988, plaintiff Timothy Looney, Jr. brought this action pursuant to 42 U.S.C. § 1983 against the City of Wilmington and police officers Donald R. Roberts and Jeffrey DeHart in their individual and official capacities. The plaintiff alleges that the defendants violated his rights under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure. Specifically, the plaintiff alleges that the defendants conducted an illegal search of his building and used excessive force against his person.[1] The plaintiff has also alleged a state law claim of battery against the defendants. The defen-

---

1. In his complaint, the plaintiff based his claim of excessive force on the Fourteenth Amendment's right to due process of law. Complaint at ¶¶ 20, 22. However, the plaintiff has pursued the excessive force claim solely on the basis of the Fourth Amendment's prohibition against unreasonable seizure. Indeed, subsequent to the filing of the complaint in this matter, the Su-

preme Court ruled that "*all* claims that law enforcement officers have used excessive force ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* — U.S. —, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989).

dants have moved for summary judgment on all claims.

## FACTUAL BACKGROUND

The events forming the basis for this complaint occurred on the night of November 12, 1987. Shortly before 10 p.m. that night, several officers from the vice squad of the Wilmington Police Department, including Officers DeHart and Roberts, set out to execute a Municipal Court search warrant on the first floor apartment at 1512 West 6th Street. The resident of that apartment was Anthony Whittle, who had been arrested on the street just prior to the execution of the warrant. The building is owned by the plaintiff, who lives in the upstairs apartment. When the officers reached the building, they knocked on the front door and yelled that they were police officers with a search warrant. The officers waited about five seconds after their announcement of purpose, and then they forced the door in. The officers proceeded to Mr. Whittle's apartment door, which they forced open one second after reannouncing their identity and purpose.

The officers then began conducting the search of Whittle's apartment. As Officer DeHart was about to leave that apartment, he heard someone coming down the stairs from the second floor apartment. The plaintiff then emerged from the door leading to the upstairs apartment. He was carrying a baseball bat, and was only a few feet from the officer. Officer DeHart, who was in plainclothes but who claims that he was wearing a badge, twice identified himself as a police officer and asked Mr. Looney to put down the bat. Plaintiff's next actions with the bat are in dispute. Officer DeHart states that the plaintiff raised the bat in a threatening manner. The plaintiff states that he did not raise the bat but instead turned to put the bat down after the officer's request.

The plaintiff and Officer DeHart then engaged in a physical struggle. Officer Roberts, who was still in Whittle's apartment, witnessed the confrontation and went to assist his fellow officer. The facts of the struggle between the plaintiff and the two officers are somewhat in dispute. The following facts, however, are undisputed. The struggle began when Officer DeHart grabbed the plaintiff and told him he was under arrest. When Officer Roberts joined the fray, Officer Roberts punched the plaintiff in the head five or six times. Plaintiff fought back to some extent during the struggle.[2] The confrontation ended shortly after Officer DeHart used his blackjack on the plaintiff's head. The plaintiff received six sutures for a head wound resulting from the use of the blackjack.

The parties have two main factual disputes over what occurred during the struggle. First, and most important, the plaintiff alleges that he was handcuffed soon after the struggle began, and that both officers continued beating him afterwards. The officers claim that the plaintiff was handcuffed at the end of the struggle. Second, the plaintiff alleges that the officers struck him several times with the blackjack. The officers allege that he was struck only once.

After Mr. Looney's confrontation with the officers, he was charged with several crimes, including menacing and resisting arrest. He was convicted of both those charges by the Municipal Court for the City of Wilmington. Mr. Looney appealed those convictions to the Delaware Superior Court. The Superior Court dismissed the appeal of the menacing conviction because of lack of subject matter jurisdiction.[3] A Superior Court jury heard the resisting arrest charge on appeal and found Mr. Looney not guilty.

In this suit, the plaintiff alleges that the search executed by Officers DeHart and

2. Officer Roberts claims that Mr. Looney was swinging his arms and kicking his feet at the officers. Mr. Looney admits that he struggled with the officers but he contends that he was merely trying to stop the officers from beating him.

3. The Delaware Constitution states that there shall be an appeal to the Superior Court in all cases where the fine exceeds $100. Del. Const. art. IV, § 28. The plaintiff had been fined only $100 for his menacing conviction.

Roberts violated the Fourth Amendment's prohibition against unreasonable search because it did not comply with the knock-and-announce rule. In addition, the plaintiff claims that Officers Roberts and DeHart violated the Fourth Amendment's prohibition against unreasonable seizure by using excessive force against him. The plaintiff also alleges that the officers committed battery against him. Defendants move for summary judgment on four grounds. First, the defendants allege that, as a matter of law, the officers did not violate the plaintiff's Fourth Amendments rights with respect to both the search and the seizure. Second, the defendants allege that the city is immune from liability. Third, the defendants allege that the officers are immune from liability based on the doctrine of qualified immunity. Fourth, the defendants claim that the plaintiff's pendent state law battery claim should be dismissed if the federal claims are dismissed.

For the reasons discussed below, this court grants summary judgment for the defendants on the issues of the legality of the search and municipal liability. The court denies summary judgment on all other issues raised.

### PRELIMINARY DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that a moving party is entitled to summary judgment if there is no genuine issue of material fact and that party is entitled to judgment as a matter of law. The party opposing summary judgment may not rest on the allegations of his pleadings but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. Fed.R. Civ.P. 56(e).

In ruling on a summary judgment motion, a court must view all facts, and any reasonable inference from those facts, in the light most favorable to the party opposing summary judgment. *Wilmington*

*Housing Authority v. Pan Builders, Inc.*, 665 F.Supp. 351, 353 (D.Del.1987). The mere existence of *some* factual dispute will not by itself defeat a motion for summary judgment; there must be a *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A dispute is not genuine if no reasonable jury could return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. at 2510. As to materiality, only disputes over facts that might affect the outcome of the suit will properly preclude the entry of summary judgment. *Id.*

Plaintiff brought this suit pursuant to 42 U.S.C. § 1983.[4] The two elements a plaintiff must show in a § 1983 claim are: 1. the conduct complained of was committed by a person acting under color of state law, and 2. the conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–665, 88 L.Ed.2d 662 (1986). Section 1983 does not provide any substantive rights; rather, it provides only a remedy for violations of other rights. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). The defendants in this action are not contesting that the officers acted under color of state law. Thus the inquiry on this motion for summary judgment is whether plaintiff can meet the second element of a § 1983 claim. Plaintiff seeks to do so by alleging violations of his Fourth Amendment rights against unreasonable search and seizure.

### THE CONSTITUTIONALITY OF THE SEARCH

The first issue the court will address is the constitutionality of the search. The

---

**4.** 42 U.S.C. § 1983 states, in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other per-

son within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

Fourth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The analysis for ruling on the constitutionality of a search under the Fourth Amendment is to determine whether the search was reasonable. *See Ker v. California*, 374 U.S. 23, 33, 83 S.Ct. 1623, 1629, 10 L.Ed.2d 726 (1963). Since there are no factual disputes on the conduct of the search, this court must decide whether the search was reasonable as a matter of law.

The plaintiff alleges that the search was improper because, as a ·resident landlord, he had a right to be notified of the search prior to its occurrence. As part of his claim, the plaintiff alleges that the knock-and-announce procedure used by the police was inadequate. Specifically, the plaintiff alleges that the amount of time between the announcement of police presence and the breaking in of the two doors was insufficient to give the plaintiff time to let the officers in peacefully.

The common law provides that, prior to forceably entering a residence to execute a warrant, a police officer is required "to signify the cause of his coming, and to make a request to open the doors". *Dyton v. State*, 250 A.2d 383, 385 (Del.1969).[5] This requirement, referred to as the "knock-and-announce rule", has two purposes. *Tatman v. State*, 320 A.2d 750, 751 (Del.1974). First, it protects the privacy of residents by preventing police entry of a home without reasonable warning. *Id.* Many courts have held that the residents should be given an opportunity to surrender the premises voluntarily. *E.g., Commonwealth v. DeMichel*, 442 Pa. 553, 561, 277 A.2d 159, 163 (1971). The second purpose of the knock-and-announce requirement is to reduce the possibility of danger to the officer and the residents which might result if the residents misunderstood

the purpose of the entry. *Tatman*, 320 A.2d at 751.

■ The plaintiff contends that the officers should have contacted him prior to the search, either by using the buzzer on the outside of the building or by waiting a sufficient amount of time after knocking on the building door so the plaintiff could have let them in. The plaintiff, however, has cited no cases which hold that the knock-and-announce rule requires police to contact resident landlords prior to executing search warrants on apartments in their buildings, and this court has seen no cases so holding. Such a requirement could be extremely burdensome to law enforcement. In addition, prior notification of the landlord might result in the destruction of evidence, because the landlord could give notice to the persons involved.

■ Although the plaintiff had no right as a resident landlord to be contacted prior to the search, the court must still examine whether the officers' actions met the purposes of the knock-and-announce rule and thus were reasonable as a matter of law. The purposes of the rule, as stated above, are to protect the residents' privacy and to prevent danger resulting from a misunderstanding. *Tatman*, 320 A.2d at 751. The Delaware Supreme Court has held that police officers executing a warrant at an apartment building must knock and announce at the building's outer door and at the apartment door. *Id.* While it is easy to see how the knock on an apartment door serves the two purposes of the knock-and-announce requirement, the court in *Tatman* did not fully discuss how these purposes are served by the required knock on the outside door of an apartment building. The first purpose behind the rule, that of protecting the privacy of residents, seems to apply only to the knock on an apartment door. The lobby of an apartment building is not considered a private place. In addition, it would be absurd to require the

5. While some courts have viewed the Supreme Court's decision in *Ker v. California* as stating that the Fourth Amendment requires police officers to announce their identity and purpose prior to using force to enter private premises, see *Tatman v. State*, 320 A.2d 750, 751 (Del. 1974), the Court in that opinion never explicitly so stated. *See Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

police to wait for an apartment resident to answer a knock on the front door of an apartment building. The second purpose behind the rule, then, would seem to be the sole reason for requiring a knock on the outside door. That is, police officers should knock on the outside door of the building in order to decrease the possibility of danger to the officers and the residents resulting from a misunderstanding. However, the fact that not all residents might hear the knock and announcement is irrelevant. As defendants point out, police officers are not required to knock on each door of a multi-unit dwelling to ensure that everyone is aware of their purpose. Rather, police officers need only knock and announce their presence so that anyone who might be standing near the front door will not misunderstand the officers' entry.[6] Since the sole purpose is notification, there would therefore seem to be little if any time required between the knock and the entering of the building.

Based on the above principles, the knock-and-announce procedure done at the building's front door was adequate. Officer Roberts stated that he knocked on the door four or five times. He and several other officers also yelled their presence and purpose. This court finds that the officers' actions at the front door of the building were reasonable as a matter of law.[7]

As to the knock on the interior door, plaintiff cannot be heard to complain

about its adequacy. First, plaintiff is apparently claiming property damage resulting from the search. Record at A–320. Officers executing search warrants on occasion must damage property in order to perform their duty. *Dalia v. United States*, 441 U.S. 238, 258, 99 S.Ct. 1682, 1693, 60 L.Ed.2d 177 (1979) (dictum). Destruction of property that is reasonably necessary to effectively execute a search warrant would not violate the Fourth Amendment. *See Tarpley v. Greene*, 684 F.2d 1, 9 (D.C.Cir.1982). However, it is unclear from plaintiff's answers to interrogatories what door he is claiming damage to, the building door or the apartment door. In addition, even if the defendants had waited a longer period of time before forcing open the apartment door, they still would have had to use force to enter because no one was in the apartment to let them in. A second reason the plaintiff cannot raise the issue of the knock on the apartment door is that he had no privacy expectation in Mr. Whittle's apartment.[8] The plaintiff's ownership of the building is not sufficient to establish a privacy right with respect to the individual apartments. *See United States v. Rios*, 611 F.2d 1335, 1345 (10th Cir.1979).[9]

This court finds that the search was reasonable as a matter of law with respect to plaintiff's interests. The court thus grants summary judgment for defendants on this issue.

---

**6.** In *State v. Rudisill*, for example, the police officers announced their presence and purpose to someone who had just exited the building's outside door that led directly to the apartment to be searched. 20 N.C.App. 313, 201 S.E.2d 368, 369 (N.C.Ct.App.1973). The North Carolina appeals court held that the announcement to the guest "fills the requirement that such notice be given as will identify the officer to protect the occupants and the officer." *Id.*

**7.** Since there is no real time required between the knock and entry, the fact that only five seconds elapsed is not relevant.

**8.** The Supreme Court has stated, "capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."

*Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968).

**9.** In *Rios*, the defendant owned the premises searched, a mobile home. 611 F.2d at 1344. He had made an agreement with another person to sell the home. *Id.* However, the defendant retained legal title until the buyer made all the payments to the bank. *Id.* During the time period when the buyer was making the payments, which included the time when the search occurred, the buyer had the right to immediate and exclusive possession of the home. *Id.* The court there stated that the defendant's "bare legal ownership" of the home was insufficient to demonstrate that his Fourth Amendment privacy interest had been invaded. *Id.* at 1345. In this case, only Mr. Whittle had the right to live in his apartment; the plaintiff had no privacy interest in it.

## THE CONSTITUTIONALITY OF THE SEIZURE

The plaintiff also objects to the manner in which the officers confronted him. The plaintiff alleges that the defendants violated the Fourth Amendment's prohibition against unreasonable seizures by using excessive force against him.

Whenever a police officer restrains the freedom of a person to walk away, the officer has seized that person. *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Seizures are subject to the Fourth Amendment requirement that they be reasonable. *See id.* More specifically, the constitutionality of a seizure is determined by balancing the extent of the intrusion on the individual's Fourth Amendment interests against the government's need for the intrusion. *Metcalf v. Long,* 615 F.Supp. 1108, 1118 (D.Del.1985); *see Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Factors that should be considered in determining reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than from the perspective of perfect hindsight. *Id.*

The plaintiff contends that there was no need for force to be used in this case, and that, at any rate, the force used was excessive. The question of the need for force depends on the circumstances prior to Officer DeHart's initial physical contact with the plaintiff. Officer DeHart claims that the plaintiff raised the bat as if to strike him, while the plaintiff says he turned to put the bat down after the officer requested that he do so. On a motion for summary judgment, this factual dispute would normally mean the end of the court's inquiry. However, the defendants seek to use the collateral estoppel effect of plaintiff's menacing conviction to preclude the plaintiff from litigating the issue of the manner in which he held the bat. The defendants contend that the menacing conviction showed that the plaintiff had put Officer DeHart in fear for his safety, thus demonstrating his need to apply force. Resolution of the collateral estoppel issue is thus a prerequisite to reaching the question of whether Officer DeHart had the right to use force.

Under the doctrine of collateral estoppel, once a court has decided an issue of fact necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). A defendant in a § 1983 action may assert the collateral estoppel effect of issues decided in state criminal proceedings against the plaintiff. *Id.* at 104, 101 S.Ct. at 419. In determining the collateral estoppel effect of a state proceeding, a federal court must apply the law of the state where the criminal proceeding took place and must also ascertain whether the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue decided in the state court. *Anela v. City of Wildwood,* 790 F.2d 1063, 1068 (3d Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384 (1986).

The Delaware courts follow a four-part test for applying collateral estoppel. *Taylor v. State,* 402 A.2d 373, 375 (Del.1979). Collateral estoppel requires that (1) a question of fact essential to the judgment (2) was litigated (3) and determined (4) by a valid and final judgment. *Id.* The last three elements are not in dispute here. Thus the only question to be decided is whether the prior factual determination was essential to the menacing conviction. The difficulty here is that the specific facts on which the conviction rested are not disclosed in the record. However, courts can make logical inferences from prior proceedings to determine what issues were decided. A court can examine the record of a prior proceeding, including

the pleadings and the evidence, and conclude whether a rational factfinder could have grounded its verdict upon an issue other than that which the party seeks to collaterally estop. *Ashe v. Swenson,* 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *United States v. Redman,* 500 F.Supp. 453, 455–56 (D.Del.1980).

 In this case, the prior judgment was the plaintiff's conviction for menacing. A person is guilty of menacing when "by some movement of his body or any instrument he intentionally places another person in fear of imminent physical injury." Del. Code Ann. tit. 11, § 602 (1987). The menacing indictment charged the plaintiff with using an instrument to intentionally place another person in fear. Record at A–11. Based on the facts of the altercation between the officers and the plaintiff, the indictment was unquestionably referring to plaintiff's use of the bat.

Plaintiff's counsel notes, however, that it is unclear whether the plaintiff menaced Officer DeHart before physical contact with him, thus justifying some response by the officer, or after physical contact had begun. The record indicates that the plaintiff continued to hold the bat after Officer DeHart's initial use of force. Record at A–39. This court finds that the Municipal Court must have convicted Mr. Looney based on his actions with the bat *prior to* physical contact with the officer. First, acts of menacing would logically seem to end once physical contact begins, much like an assault would turn into a battery. The struggle between the plaintiff and the officers was continuous, and there was no apparent break which would indicate that the plaintiff again waved his bat threateningly. Second, an essential element of menacing is that the victim be placed in fear. The record of the menacing conviction shows that Officer DeHart was asked how he felt prior to physical contact with the plaintiff. Record at A–84. He stated that he was afraid of bodily injury. The officer was not asked at any time whether he was afraid during the struggle. In addition, Officer Roberts was not asked how *he* felt, even though Officer DeHart testified that

the plaintiff still had the bat after Officer Roberts joined the tussle. Record at A–40. The factual determination essential to the prior judgment must have been that Mr. Looney held the bat in a menacing fashion before his physical confrontation with Officer DeHart.

Under Delaware law, therefore, the prior factual determination would have collateral estoppel effect. The next question under *Anela* is whether Mr. Looney had a full and fair opportunity to litigate the issue in the prior proceeding. *Anela v. City of Wildwood,* 790 F.2d 1063, 1068 (3d Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384 (1986). He alleges that he did not have a full and fair opportunity to litigate, in two respects. First, he contends that he did not have access to an adequate review of the Municipal Court conviction. Second, he contends that he had little incentive to litigate the prior judgment vigorously because only a small fine was at stake.

 A party should not be able to assert the collateral estoppel effect of a prior judgment where the party against whom preclusion is sought "could not, as a matter of law, have obtained review of the judgment in the initial action". Restatement (Second) of Judgments § 28(1) (1982); *see Edwards v. Boeing Vertol Company,* 750 F.2d 13, 15 (3d Cir.1984). Defendants do not take issue with the fact that the availability of some sort of review is essential to the operation of collateral estoppel. Rather, they believe that the review available to Mr. Looney was sufficient to permit the use of collateral estoppel.

 The Delaware Constitution provides that "there shall be an appeal to the Superior Court in all cases in which the sentence shall be imprisonment exceeding one (1) month, or a fine exceeding One Hundred Dollars ($100)." Del. Const. art. IV, § 28. The plaintiff was unable to appeal his menacing conviction because he received a fine of only $100. *See* Record at A–144, A–148. However, the plaintiff could have sought a writ of certiorari to the Superior Court. Del.Code Ann. title 11, § 5716 (1987). He did not do so.

1034

The plaintiff argues that the review available on a writ of certiorari is limited to errors of jurisdiction, and thus is not sufficient to give the judgment collateral estoppel effect. In Judge Woolley's well-respected treatise on Delaware practice, the author states that, "as a broad general rule, a writ of certiorari lies from the Superior Court to inferior tribunals, to correct errors of law, to review proceedings not conducted according to law, and to restrain an excess of jurisdiction." 1 Victor B. Woolley, Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware § 896 (1906). Unfortunately, the Delaware Supreme Court seems to have taken two positions on the scope of review afforded by the writ. In *Brown v. State,* the court stated that "[t]he writ of certiorari is a writ of review to ascertain whether or not an inferior court has exceeded its jurisdiction ... errors in procedure may not be corrected by a writ of certiorari." 245 A.2d 925, 926–27 (Del.1968). The very next year, the court ruled that the writ of certiorari "brings before the Superior Court the record of the cause in the Municipal Court to correct any errors of law appearing therein." *Harris v. Municipal Court,* 256 A.2d 674, 675 (Del.1969). In addition, relatively recent Superior Court rulings issued pursuant to the writ of certiorari indicate that the court does look beyond the question of jurisdiction. *See, e.g., Bartels v. State,* No. 86A–MR–3, 1987 WL 6462 (Del. Super. Jan. 6, 1987); *Campbell v. State,* No. 85A–DE–2, 1986 WL 8178 (Del.Super. July 18, 1986).

Even though the Delaware courts seem unclear on the scope of review afforded pursuant to the writ of certiorari, this court believes that the plaintiff here cannot be heard to raise this issue. The plaintiff did not attempt to obtain the writ. Collateral estoppel should not be barred "where review is available but is not sought." Restatement (Second) of Judgments § 28(1) comment a (1982). While a decision not to obtain review might be understandable if

the review clearly addressed only jurisdictional matters, this court believes that the plaintiff should have attempted to obtain a writ because there is substantial authority that it allows the Superior Court to go beyond jurisdictional questions.

 The second assertion plaintiff makes with respect to whether he had a full and fair opportunity is that he did not have a full incentive to litigate the menacing charge because the amount at stake was only $100. The Restatement (Second) of Judgments states that issue preclusion should not apply when "the party sought to be precluded ... did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action." § 28(5) (1982). The comments to that subsection provide the following example: "the amount in controversy in the first action may have been so small in relation to the amount in controversy in the second that preclusion would be plainly unfair." *Id.* at comment j.

Plaintiff's contention that he did not have enough incentive to litigate the prior action is unconvincing. The crime of menacing is a class B misdemeanor. Del.Code Ann. title 11, § 602 (1987). Class B misdemeanors are punishable by up to and including six months' imprisonment and a fine not exceeding $500. Del.Code Ann. title 11, §§ 4206, 4207 (1987). Even though Mr. Looney received a small fine at the conclusion of the proceedings, the threat of incarceration was sufficient incentive for him to litigate fully all the issues in the prior action.

 This court thus finds that the plaintiff had a full and fair opportunity to litigate in the previous action. Since defendants have also established all the required elements of collateral estoppel, this court holds that the plaintiff is precluded from relitigating the issue of the manner in which he held the bat prior to his physical confrontation with Officer DeHart.[10] Since

---

**10.** The plaintiff raises another issue regarding collateral estoppel. He contends that there are inconsistent judgments because of his conviction of menacing and his acquittal on the resist-

ing arrest charge. This court does not find these results to be inconsistent. The two crimes have different elements. *See* Del.Code Ann. title 11, § 1257 (1987). In addition, his acquittal on

the plaintiff is precluded from relitigating that issue, it is clear that Officer DeHart's actions in initially applying force to the plaintiff were reasonable because the officer feared for his own safety. The extent to which Officer DeHart initially intruded on plaintiff's Fourth Amendment interests by grabbing him was outweighed by the officer's need for self-defense.

■ Although Officer DeHart was justified in responding with force initially, it is not at all clear that the amount of force used by the officers was reasonable as a matter of law. Indeed, there are two main factual disputes that prevent this court from granting summary judgment on this issue. First, the plaintiff alleges that both officers continued beating him after he was handcuffed. He testified to that effect at his menacing trial. Record at A–122.[11] The defendants allege, however, that they did not handcuff Mr. Looney until the end of the struggle. Record at A–71. Second, the amount of force used is in dispute. The plaintiff contends that the officers struck him with the blackjack more than once. Record at A–291. The officers allege that the plaintiff was hit with the blackjack only once. Record at A–69–70. The court finds that these disputes demonstrate genuine issues of material fact. Summary judgment would thus be inappropriate.

### MUNICIPAL IMMUNITY

■ The next issue the court will address is the city's claim that it is immune from liability.[12] The Supreme Court has stated that local governments may be sued under § 1983 only for actions done pursuant to official regulations or decisions, or pursuant to governmental custom. *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Thus municipal liability does not attach solely on the basis of *respondeat superior. Id.* at 692, 98 S.Ct. at 2036. Rather, a municipality is liable for an employee's actions only when they are done pursuant to a state custom having the force of law, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970), or when they are the result of a deliberate choice to follow a course of action made by the official responsible for establishing final policy with respect to the subject matter in question. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1299–1300, 89 L.Ed.2d 452 (1986) (plurality). Recovery from a municipality is thus limited to acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered. *Id.* at 480, 106 S.Ct. at 1298. In addition, the official policy or custom must *cause* the employee to engage in the unconstitutional conduct. *Monell,* 436 U.S. at 692, 98 S.Ct. at 2036.

■ The plaintiff asserts two ways in which he believes the city should be held liable. First, the plaintiff asserts that the city admitted in its answer to plaintiff's complaint that the officers' actions were done pursuant to city policy. Second, the plaintiff claims the city can be held liable under a ratification theory because several of the officers' superiors reviewed and ap-

---

resisting arrest undoubtedly refers to what happened between him and the officers after the physical struggle began, whereas his menacing conviction was for his actions with the bat prior to any physical confrontation.

11. The defendants point out that the plaintiff's testimony on this issue at the menacing trial was contradictory. In a later question, Mr. Looney was asked what occurred after the struggle was over. He stated, "I was handcuffed, they stopped beating me and brought me back down the steps to the foyer location." Record at A–124. It is unclear to this court, however, whether Mr. Looney meant that the officers actually handcuffed him then, or whether he was just

describing the fact that he was still in handcuffs at the end of the altercation. In addition, the court believes that any possible contradiction goes to Mr. Looney's credibility, which must be examined by the factfinder.

12. The court notes that the nature of plaintiff's claims on this issue is somewhat unclear. The plaintiff's answering brief deals exclusively with the allegation that the city should be held liable under various theories for the conduct of the search. The plaintiff does not go into any detail about how these theories should make the city responsible with respect to the seizure.

proved what the officers had done.[13]

The plaintiff's first claim, that the city has admitted the officers' actions were taken pursuant to city policy, is not persuasive. In its answer, the city stated as follows: "It is admitted that the actions of Officers DeHart and Roberts in effecting the arrest of plaintiff on November 12, 1987 were not contrary to the policies implemented by the Wilmington Department of Police. To the extent that the averments contained within this paragraph suggest the existence of an unconstitutional policy or custom attributable to the City of Wilmington, they are denied." As defendants point out in their reply brief, the city was admitting only that the actions of the officers, *as understood by the city,* were not contrary to city policy. In other words, the city was accepting the officers' version of the facts and, based on that version, found nothing in city policy that would bar the officers' actions. The plaintiff's allegations that the officers continued to beat him after he was handcuffed and that the officers used the blackjack more than once were not part of the officers' version of the facts; indeed, Sergeant Roberts' report of the incident states that the plaintiff was handcuffed at the end of the confrontation, and that the blackjack was used once. The city's answer *does not* establish a basis for municipal liability.

Plaintiff puts forth a second rationale for holding the city liable—the city's alleged ratification of the officers' actions. The Supreme Court has endorsed the notion that a municipality may be held liable under a ratification theory. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality). In *Praprotnik,* the Supreme Court stated that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to

the municipality because their decision is final." *Id.*

The plaintiff in this case is attempting to show that the city ratified the officers' actions because several of the officers' superiors reviewed Sergeant Roberts' report of the incident and found that the officers had not violated departmental policy. Unfortunately, plaintiff's argument on ratification fails, for three reasons. First, the Supreme Court has never explained exactly what it meant by the ratification theory set forth in *Praprotnik.* Does ratification mean approval of a subordinate's actions *before* those actions are taken, or does it mean approval *after* the subordinate has acted? The Tenth Circuit has taken a brief look at this issue and found that approval by an employee's superior prior to an action constituted ratification. *Melton v. City of Oklahoma City,* 879 F.2d 706, 725 (10th Cir.1989). In *Melton,* a lieutenant of the Oklahoma City police department was fired by the Chief of Police for alleged violations of the Police Code of Ethics. *Id.* at 711. The lieutenant then sued the city under various federal statutes, including 42 U.S.C. § 1983. *Id.* The court noted that the City Manager was the final policymaking authority over employment decisions affecting city personnel. *Id.* at 725. "The testimony indicated that Chief [of Police] Gramling met with the City Manager and discussed the *proposed* dismissal of Mr. Melton. The City Manager expressly approved such dismissal.... Under the facts of this case, we are convinced that the City Manager ratified the Chief's actions within the meaning of *Praprotnik.*" *Id.* (emphasis added)

The Tenth Circuit thus applied the Supreme Court's ratification idea to a fact situation in which the employee's superiors approved of his actions prior to when he

---

**13.** Plaintiff states a third rationale for holding the city liable for the search. He alleges that the city failed to train its police officers how to execute search warrants on buildings occupied by the landlord. Since this court has held that the search was reasonable, plaintiff's contention on this issue is moot. The court notes, however, that even if the search did not pass constitutional muster, the city would still not be liable

under this theory. The city did not make a deliberate choice not to train its officers how to execute search warrants on buildings occupied by landlords, and the need for such training was not so obvious that the city's policymakers can be said to have been deliberately indifferent to it. *See City of Canton v. Harris,* — U.S. —, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).

took them. Of course, the Tenth Circuit did not foreclose the possibility that ratification could occur after the employee's actions were taken. However, the Supreme Court's emphasis on the element of causation in actions involving municipal liability is a second reason to find that ratification of an employee's actions must occur prior to when the employee acts. In *Monell*, the Court looked to the language of § 1983 to find that the statute imposes liability only when a government *causes* an employee to violate someone's constitutional rights. 436 U.S. 658, 692, 98 S.Ct. 2018, 2036 (1978). Clearly, a government's later ratification of an employee's actions could not in any sense be viewed as the cause of those actions. A third and final reason for rejecting the ratification theory is that, as stated above, Officer Roberts' report set forth *his* version of the facts. He did not state, for example, that the officers beat Mr. Looney after he was handcuffed. The plaintiff's attempts to hold the city liable based on its review of the officers' actions must therefore fail.[14]

Plaintiff has thus failed to establish municipal liability in this case. He has pointed to no policy or custom which caused Officers DeHart and Roberts to use the force they did. In short, he has failed to show that the officers' acts were acts of the municipality, for which the city would be liable. Rather, the officers' actions were merely acts of the *employees* of the municipality, for which the municipality is not liable. Summary judgment on this issue is therefore granted.

### QUALIFIED IMMUNITY

■ The court's inquiry is not yet complete, however. The defendants contend that the officers are immune from suit based on the doctrine of qualified immunity. Government officials performing discretionary functions are generally shielded from liability for civil damages if their conduct does not violate a clearly established constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "Clearly established" means that the contours of the right existing at the time of the allegedly unlawful action were sufficiently clear that a reasonable official would have understood that what he was doing violated that right. *Anderson v. Creighton*, 483 U.S. 635, 639, 640, 107 S.Ct. 3034, 3038, 3039, 97 L.Ed.2d 523 (1987). Police officers sued under § 1983 may claim the defense of qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 340, 106 S.Ct. 1092, 1095, 89 L.Ed.2d 271 (1986) (citing *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967)).

Based on the plaintiff's allegations in this case, this court cannot say that the officers are immune from suit. At the time this incident occurred, every person enjoyed a clearly established constitutional right to be free from unreasonable seizures. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). A reasonable officer at that time would certainly have understood that continuing to beat a handcuffed suspect was unreasonable, and thus unconstitutional. This court holds that the officers may not assert the defense of qualified immunity.[15]

### CONCLUSION

This court thus grants summary judgment for defendants on the issues of the constitutionality of the search and municipal liability. Summary judgment is denied as to the legality of the seizure and the qualified immunity of the officers. Since this court has retained some of plaintiff's federal claims, summary judgment is also denied as to his pendent state law battery claim.

---

**14.** Because this court holds that the ratification theory does not apply, the court will not examine the question of whether the officials who reviewed the officers' actions were final policymaking officials.

**15.** Since the court has granted summary judgment for defendants on the search issue, the officers' qualified immunity with respect to that is moot.

An Order will issue in accordance with this Opinion.