LUCERO, Circuit Judge,
dissenting.
Because my respected colleagues fail to apply appropriate summary judgment standards and create a circuit split by failing to adhere to Maryland v. Garrison, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the established Supreme Court jurisprudence that should govern this case, I must dissent.
I
Shortly after midnight on February 12, 2003, seven members of Utah’s Special Emergency Response Team (“SERT”) battered down the door of an apartment occu *1268 pied by Melissa Harman and Justin Over-ton at 44}6 West 2700 South, South Salt Lake City. The couple was asleep in bed— Overton unclothed and Harman in her underwear — when SERT members entered their bedroom with guns drawn. Both residents awoke in shock and fear and were immediately directed into the living room, where they were handed a single bed sheet to cover themselves and then were handcuffed to a couch. Harman was so frightened that she lost control of a basic bodily function. Officers learned that the individuals they had detained were named Melissa Hannan and Justin Overton. Harman and Overton were re-handcuffed, moved to a police van and then to a second vehicle, where defendant Scott Barnett questioned them. Meanwhile, defendant Brent Pollock directed another search of Harman and Overton’s apartment.
What the SERT team knew even before entering the Harman-Overton residence is that they were executing a warrant directed to “44 West 2700 South, South Salt Lake City,” the suspected home of two drug dealers named Isabelle and Pawoo. Although the warrant also described a “detached garage,” it did so erroneously. There was no “garage”; in fact, the only detached building was the separate apartment, with a separate address, occupied by Harman and Overton.
II
“When applying [a summary judgment] standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.” Simms v. Okla. ex rel. Dep’t of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999). With all due respect to my colleagues, they have failed to apply this standard in their recitation of the facts. When viewed in the light most favorable to Harman and Overton, there can be no doubt that the officers knew immediately upon entry that the building described in the warrant as a “detached garage” was a separate residence and that in fact, there was no garage at all.
The officers proceeded in three waves, each supervised by the defendants[1] b Pollock was the case agent and Barnett his sergeant, and they had “control the entire time.” First came the SERT team. Immediately upon entry, the SERT team knew they were not in a garage. They knew that they were in an apartment. These seven officers were followed within approximately five minutes by a team of investigating officers led by Barnett. These officers also immediately observed that the garage was, in fact, an apartment. The defendant supervisors ordered a third wave, the K-9 unit. The plaintiffs were kept in detention for an additional hour and a half until the K-9 search was completed and the police issued Harman and Overton a citation for possession of marijuana.
Investigating officers and SERT members executing the warrant overwhelmingly testified that the Harman-Overton dwelling was clearly an apartment. One officer provided the following deposition testimony:
Q. Was it obvious to you that it was an apartment, a kitchen and things like that?
A. Uh-huh (affirmative), yeah.
Q. Was there any question in your mind that you were looking at a residence when you walked in there?
*1269 A. No. Once I was in there, no.
A second member of the search team similarly testified:
Q. Did it look like a garage to you?
A. No, it was kind of — kind of a seedy apartment, kind of run down.
Q. Run-down, seedy apartment?
A. Uh-huh (affirmative).
Q. Okay. And it was obvious to you right away when you walked in, right? A. From the inside, yes.
The same officer confirmed that he knew the apartment was “[sjomebody’s living quarters” within “a few seconds of when [he] walked in.”
Testimony of other law enforcement officials on the scene corroborates the fact that Harman and Overton’s home was “obvious[ly]” an apartment. One SERT member stated it “was obvious it was an apartment. It was obvious people were living in there as some kind of an apartment.” Daniel Fuhr, the team leader for the search, testified, “Someone was living there. It was obvious.” Fuhr also testified that he “w[as] concerned that it might be a residence” before the search even began, and that he warned Pollock of his concern.
Several officers testified that they were surprised to find an apartment rather than a garage. One stated he “was surprised that there was a living quarter back over there because our information that we got, it was a garage.” Another officer, when asked whether “it looked like it could be some sort of an apartment,” responded, “Once I got in, yeah. It actually surprised me that it was.”
Ignoring the obvious, the defendants tell a different tale. Pollock averred that he saw “no indication that [the apartment] was a secondary residence.” Instead, he testified that he believed “maybe they were just out in the garage partying.” A jury might be free to credit this testimony; we are not. In reviewing a grant of summary judgment in favor of defendants, we must apply summary judgment jurisprudence and assume that it was “obvious” that Harman and Overton’s home was an apartment and that this fact was clear to law enforcement as soon as they broke down the door.
Ill
Although the majority fails to recite the pertinent facts in the light most favorable to the plaintiffs, its more serious mistake is in misreading Maryland v. Garrison[2] In Garrison, the Supreme Court spoke clearly and unambiguously: Police are “required to discontinue the search ... as soon as they discovert] that there [a]re two separate units ... and therefore [a]re put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.” 480 U.S. at 87, 107 S.Ct. 1013.
Instead of applying Garrison, the majority opinion stands it on its head. What Garrison requires is for officers to “discontinue the search” once they were “put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant,” id.; the majority instead rules that henceforth officers may detain individuals and continue the search of a home erroneously included in a warrant until the detainees can prove to the officers that they are “unconnected to the illegal activity described in the warrant,” (Majority Op. 1261 (quoting Garrison, 480 U.S. at 87, 107 S.Ct. 1013).) In other *1270 words, my colleagues require plaintiffs to satisfy police that their separate apartment was not serving as a “crash pad” for their drug dealing neighbors before a search and detention need be ceased. That is simply not the standard under clearly established Fourth Amendment law. And this is not a state of affairs that should be allowed to exist under our Constitution.
A
In Garrison, police had a valid warrant to search the “third floor apartment” of a building. 480 U.S. at 80, 107 S.Ct. 1013. In executing the warrant, police learned that the third floor actually contained two separate apartments, only one of which belonged to the person being investigated. Id. While searching the apartment erroneously named in the warrant — under the reasonably mistaken belief that they were searching the suspect’s apartment — police discovered and seized contraband. Id. Police immediately discontinued their search after realizing they were not in the suspect’s apartment. Id. at 81, 107 S.Ct. 1013. The Supreme Court held that the contraband was not obtained in violation of the Fourth Amendment because it was discovered before police would have reasonably realized their mistake. Id. at 86, 107 S.Ct. 1013. Had the timing been reversed, so too would have been the outcome:
[A]s the officers recognized, they were required to discontinue the search of [defendant’s] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant. The officers’ conduct and the limits of the search were based on the information available as the search proceeded.
Id. at 86-87, 107 S.Ct. 1013.
Once put on notice that they are searching a second apartment under a warrant authorizing the search of only a single home, police may continue searching the second apartment only if: (1) they procure an additional warrant or (2) both probable cause and exigent circumstances exist. See id.; United States v. Karo, 468 U.S. 705, 714-15, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (“Searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances.”). As one circuit court has explained, upon realizing there is a second apartment, police are “obligated to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search.” United States v. Ritter, 416 F.3d 256, 266 (3d Cir.2005). Police may not, as the majority suggests, continue searching the second apartment until they rule out the possibility that its residents are in some way connected to the illegal activity being conducted in a nearby home. The majority-created law enforcement right to confirm that an apartment is unconnected to illegal activity occurring elsewhere before discontinuing a search, (Majority Op. 1264 n. 4), is antithetical to law enforcement’s duty to immediately discontinue searching when put on notice of a risk that an apartment was erroneously included in the warrant, Garrison, 480 U.S. at 87, 107 S.Ct. 1013.
Garrison strikes a measured balance between the sanctity of the home and “the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants.”[3] 480 U.S. at 87, 107 S.Ct. 1013. The major *1271 ity upsets that balance by rejecting the Garrison test of a “unit erroneously included within the terms of the warrant,” id., instead substituting a dramatically looser “unconnected to the illegal activity described in the warrant” standard. (Majority Op. 1261.)
B
It is not only the plain text of Garrison that contradicts the majority’s analysis; a review of Garrison’s underlying principles leaves no doubt that the grant of summary judgment in the case before us was erroneous. Garrison is merely a particular application of the general rule that police cannot rely on a warrant after learning facts that vitiate probable cause. “[OJnce the mistake is discovered, the government cannot use the authority of the warrant, or of the order, to conduct a search or interception that they know is unsupported by probable cause or is otherwise outside the scope of the statute or the Constitution.” United States v. Ramirez, 112 F.3d 849, 851-52 (7th Cir.1997) (citing Garrison, 480 U.S. at 87, 107 S.Ct. 1013); see also United States v. Bowling, 900 F.2d 926, 933 (6th Cir.1990). Consequently, the appropriate Fourth Amendment analysis is not whether two apartments are somehow connected, as the majority contends, but whether police knew or reasonably should have known that they lacked probable cause to search the second apartment based on knowledge gained during the execution of the warrant. The defendants here point to no facts that would provide probable cause to search Harman and Overton’s home. Consequently, the search was unconstitutional.
Moreover, defendants clearly lacked probable cause to search Harman and Overton’s home once they discovered it was an apartment. It has long been the rule that “[pjrobable cause must be shown for searching each house or, in this case, each apartment.” United States v. Hinton, 219 F.2d 324, 325-26 (7th Cir.1955); see also United States v. Perez, 484 F.3d 735, 741 (5th Cir.2007); Shamaeizadeh v. Cunigan, 338 F.3d 535, 552-53 (6th Cir.2003); Mena v. City of Simi Valley, 226 F.3d 1031, 1038 (9th Cir.2000); United States v. Rios, 611 F.2d 1335, 1347 (10th Cir.1979), disapproved on other grounds in United States v. Young, 470 U.S. 1, 14 n. 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). An apartment is entitled to the heightened Fourth Amendment protections afforded to any home. Once law enforcement discover that a unit is an apartment, they are no longer free to treat it as an outbuilding or garage, no matter the wording of the warrant. To reiterate, on summary judgment, we must credit testimony from law enforcement that the building did not look like a garage, but appeared to be an apartment.
To determine whether probable cause existed to search the plaintiffs’ residence, one need simply consider whether the magistrate would have issued a warrant to search the apartment if provided the information that police immediately discovered upon entering Harman and Overton’s home. Obviously, the magistrate would not have done so. If the affidavit had accurately described Harman and Over-ton’s home as an “apartment” rather than a “detached garage,” then the magistrate would have required distinct probable cause to search the apartment. But nothing in the affidavit suggests that evidence of illegal activity would be found in the apartment.[4] The belief that the building *1272 was a garage was in error, and proximity is insufficient to create probable cause. See Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (“[Mjere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause.... ”).
The majority dodges the foregoing analysis. Rather than considering whether police knew they lacked probable cause to search the subject apartment, the majority holds that Pollock’s inchoate suspicion that Harman was “just somehow intertwined with this” justified what amounts to the warrantless search of a home. No officer could reasonably believe that such a hunch provides probable cause. See United States v. Concepcion Marie Ledesma, 447 F.3d 1307, 1316 (10th Cir.2006) (probable cause requires “a particularized and objective basis for suspecting legal wrongdoing” (quotation omitted)).[5]
A reasonable jury could determine defendants directed the detention of Harman and Overton and two searches of their home long after being put on notice that they lacked any legal basis to do so. Therefore I would hold that plaintiffs met their summary judgment burden of showing a Fourth Amendment violation.
IV
Because the majority opinion holds Harman and Overton failed to create a genuine dispute as to whether defendants violated the Fourth Amendment, it does not address whether plaintiffs’ claims are grounded in clearly established law. I would hold that they are. Prior to the majority’s decision in this case, the law was well settled that police are “required to discontinue the search” immediately upon being “put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.” Garrison, 480 U.S. at 87, 107 S.Ct. 1013. When defendants executed the warrant in this case, Garrison had been the law for more than fifteen years. This Supreme Court precedent should have made the contours of the Fourth Amendment “sufficiently clear” to the defendants. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Indeed, in an earlier appeal of this case, the parties did not dispute that “the law in this area was well-established at the time of the search in question.” Harman v. Pollock, 446 F.3d 1069, 1077 (10th Cir.2006) (quotation omitted).
V
Viewing the evidence presented in the light most favorable to the non-moving *1273 parties, the plaintiffs have demonstrated: (1) that a reasonable jury could determine that defendants violated the Fourth Amendment; and (2) that the rights at issue were clearly established at the time of defendants’ unlawful conduct. Consequently, I would reverse the grant of summary judgment.

. Pollock and Barnett’s supervision included maintaining constant radio contact with all law enforcement on the scene. In addition to enabling direct communication, the radios allowed Pollock and Barnett to "overhear ... conversations going back and forth” among officers.

. I agree with the majority that Garrison, rather than Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), provides the appropriate framework for determining the constitutionality of defendants’ actions. (Majority Op. 1261-62 & n. 2.)

. Contrary to the majority's assertion, searching Harman and Overton’s home two additional times and detaining them for approximately two hours after discovering the separate apartment in which they were residing was not a garage cannot be classified as *1271 an "honest mistake.” (Majority Op. 1264-66, n. 4.)

. The fact that Harman’s name was listed on the gas utility statement for the main residence may be relevant to whether the warrant was overbroad when issued. But it assuredly is not relevant to the inquiry of whether probable cause continued to exist after officers *1272 discovered the detached garage was a separate residence.

. In addition to Pollock’s hunch, the majority relies on the discovery of a small amount of marijuana to justify defendants’ actions. The majority does recognize the evidence showing that the contraband was not discovered until after SERT members secured the home, but fails to legally credit the consequence of these facts in its analysis. (Majority Op. 1264-65.) Viewing this evidence in the light most favorable to plaintiffs, the discovery occurred after defendants knew the "detached garage” was actually an apartment, which was immediate. Because police were obligated to withdraw as soon as they discovered the fact that they had entered an apartment, they were not "lawfully in a position from which the [marijuana] was in plain view”; thus the marijuana may not be considered. United States v. Angelos, 433 F.3d 738, 748 (10th Cir.2006) (quotations omitted). Only by holding that the officers could continue their search until Harman and Overton proved that they were not "connected to the illegal activity” at the nearby home can the majority bring the seizure of the marijuana within the plain view exception. (Majority Op. 1265.)